

CASE UNSEALED KCM 6/18/13

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>v.<br>**ERGUN YILDIZ (1),**<br>**ARASH GHAHREMAN (2),**<br>Defendants. | Mag. Case No. '13 MJ 2303<br><u>COMPLAINT FOR VIOLATION OF</u><br>Title 50, U.S.C., Secs. 1702 and 1705(a), and Title 31, C.F.R., Part 560 - Conspiracy to Export to Embargoed Country |

The undersigned complainant, being duly sworn, states:

Count 1

CONSPIRACY TO EXPORT TO AN EMBARGOED COUNTRY

Beginning on a date unknown and continuing through on or about June 17, 2013, within the Southern District of California, and elsewhere, defendants ERGUN YILDIZ and ARASH GHAHREMAN did knowingly and willfully agree and conspire with other persons, known and unknown, to:

a. export and cause the exportation, sale, and supply, indirectly, of marine navigation equipment and military electronic equipment from the United States to Iran and the Government of Iran in violation of the embargo imposed upon that country by the United States, without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of the Treasury, in violation of Title 31, Code of Federal Regulations, Part 560.204; and

b. engage in transactions within the United States that evade and avoid, and have the purpose of evading and avoiding, the prohibition against exporting, reexporting, selling and supplying, directly and indirectly, marine navigation equipment and military electronic equipment from the United States to Iran without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of Treasury, in violation of Title 31, Code of Federal Regulations, Part 560.203;

all in violation of Title 50, United States Code, Sections 1702 and 1705(a).

And the complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

Kevin M. Hamako, Special Agent
Homeland Security Investigations

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE,
THIS 17 DAY OF JUNE, 2013.

HON. WILLAM MCCURINE, JR.
United States Magistrate Judge

**CONTINUATION OF COMPLAINT RE:**
**ARASH GHAHREMAN**

## STATEMENT OF FACTS

1. I am a Special Agent with United States Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since August 2010. Before my employment with HSI, I was employed as a Special Agent with the United States Air Force Office of Special Investigations. I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia, where I was trained in various types of criminal investigations including narcotics investigations, financial investigations and counter proliferation investigations. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants under the authority of the United States. As an HSI Special Agent, I am currently assigned to conduct investigations involving the illegal exportation of technology into and out of the United States. I have participated in numerous such criminal investigations. In preparing this affidavit, I have consulted with other HSI Special Agents with a combined federal law enforcement experience of approximately 20 years. Because this statement of facts is prepared for the limited purpose of supporting a criminal complaint and obtaining an arrest warrant, it does not contain all facts known to me concerning the investigation. When referring to email messages, the messages are quoted or summarized only in part.

### A. The Iran Trade Embargo

2. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

3. On March 15, 1995, the President issued Executive Order 12957, finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declaring "a national emergency to deal

with that threat." Executive Order 12957, as expanded and continued by Executive Orders 12959 and 13059, was in effect at all times relevant to this Complaint.

4. Executive Orders 12959 and 13059 (collectively, with Executive Order No. 12957, the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States.

5. Pursuant to the Executive Order, the United States Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Section 560.203 of the Iranian Transactions and Sanctions Regulations prohibits any transaction within the United States that evades or avoids, or attempts to or has the purpose of evading or avoiding, any of the other Iranian Transaction and Sanctions Regulations. Section 560.204 prohibits the unauthorized exportation, reexportation, sale, or supply, directly or indirectly, from the United States of any goods, technology, or services to Iran or the Government of Iran.

6. The Department of Treasury's Office of Foreign Assets Control ("OFAC") administers the authorization and issuance of licenses for any exports subject to the Iranian Transactions and Sanctions Regulations. With very limited exceptions, in the absence of a license, or other prior approval, it is illegal under IEEPA and the Iranian Transactions and Sanctions Regulations to export products or services to Iran without a license, or to export the products or services to a third country if the export is intended or destined for Iran.

**B. Background re GHAHREMAN and YILDIZ**

7. Since in or about December 2012, Homeland Security Investigations have been investigating Arash GHAHREMAN ("GHAHREMAN") and Ergun YILDIZ ("YILDIZ") for their involvement in an Iranian procurement network seeking to illegally acquire and export goods and technology from the U.S. for transshipment to, and end use in, Iran. Based on my training and experience and training in counter-proliferation cases, along with the training and experience of my colleagues, I know that the activities of GHAHREMAN and YILDIZ, described below, are consistent with efforts by individuals to illegally procure goods and technology on behalf of Iranian end users. I

know that individuals involved in the illegal procurement of U.S. goods/technology for end use in Iran often use middlemen, including U.S. citizens and/or "front" companies in third countries, such as the United Arab Emirates ("U.A.E."), to approach U.S. suppliers. I also know that such individuals take other steps to disguise the fact that the end use for the goods and technology is Iran. These steps include: not disclosing the ultimate/destination of the goods/technology to the U.S. suppliers, and falsely listing "front" companies in third countries as the ultimate end user. Additionally, I know that individuals involved in the illegal procurement of U.S. goods/technology destined for end use in Iran, frequently use Dubai as a transhipment point because of its geographic location and close proximity to Iran. These processes all serve to avoid economic sanctions and shield the Iranian end users from discovery and prosecution by law enforcement.

8. GHAHREMAN is a naturalized U.S. citizen who was born in Iran, and presently resides in the U.S. During the course of this investigation, GHAHREMAN has been acting as a U.S. representative of a company in Dubai ("the Dubai Company") and its founder/director (coconspirator 1 ("C-1")) and president, YILDIZ. C-1 is a citizen of Iran. Based on the HSI investigation, including a review of internet protocol addresses and log in activities for C-1's email accounts, it appears that C-1 resides in Iran. According to statements of C-1, because of C-1's Iranian nationality and for *"smooth operation"* of the Dubai Company, C-1 assigned *"a German guy,"* i.e., YILDIZ, as the manger on the licensing paperwork of the Dubai company. YILDIZ is a German national and resident of Dubai, U.A.E. As discussed below, he identified himself as a *"partner"* of C-1.

9. GHAHREMAN has a history of ties to Iran, including an employment history by the Iranian government and companies, to include: (1) serving as a Navy Lieutenant and Technical Design Department Officer in the Iranian Marine Navy Factories and Shipyard from October 1994 to September 1996; (2) Ship Engineer Officer for Irano Hind Shipping Company ("IHSC") from October 1997 to May 2003; and (3) Marine Offshore Engineer for Iran Marine Industrial Company ("SADRA") from July 2006 to January 2007. GHAHREMAN also received training as a Marine Engineering Officer from the Islamic Republic of Iran Shipping Lines Trainee Institute ("IRISL"). In September 2008, both IRISL and IHSC were placed on OFAC'S Specially Designated Nationals and Blocked Persons List (the "OFAC Blocked List"), which targets proliferators of weapons of mass destruction ("WMD") and their delivery

systems. Specifically, these designations were based on those entities involvement in the provision of logistical services to Iran's Ministry of Defense and Armed Forces Logistics, the arm of the Iranian military that oversees its ballistic missile program. In June 2010, the United Nations followed with sanctions against IRISL as part of United Nations Security Council Resolution 1929. In March 2012, SADRA was also placed on the OFAC Blocked List based on its association with IRISL and for engaging, or attempting to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of WMDs or their means of delivery. The contents of 2012 email communications of GHAHREMAN and YILDIZ obtained via federal search warrant also evidence that GHAHREMAN and YILDIZ are each aware of the trade sanctions against Iran.

**C. The Goods and Technology Sought by <u>GHAHREMAN, YILDIZ and their Coconspirators</u>**

10. GHAHREMAN and his coconspirators sought numerous U.S. goods and technology from the U.S. suppliers and manufacturers. Ultimately, as discussed below, GHAHREMAN and his coconspirators entered into sales contracts to purchase four (4) units of maritime navigation equipment and fifty (50) units of military electronic equipment as described below:

a. **Navigation Equipment** - The NAVIGAT 2100 Fiber Optic Gyrocompass and Attitude Reference System ("NAVIGAT 2100") is manufactured by Northrop Grumman Sperry Marine ("Northrop"), located in Charlottesville, Virginia. The NAVIGAT 2100 Fiber Optic Gyrocompass is used in maritime navigation applications.

b. **Military Electronic Equipment** - The Planar Triode Y-690 ("Y-690") is an electron tube manufactured in the United States by Communications and Power Industries and is designed for use in airborne, ground, and space applications, including military airborne radar.

**D. <u>Activities by GHAHREMAN and Coconspirators Seeking the NAVIGAT 2100</u>**

11. In December 2012, C-1 directed GHAHREMAN to contact U.S. suppliers of the NAVIGAT 2100 and request to purchase four to six units of the NAVIGAT 2100. In response to C-1's request, GHAHREMAN informed C-1 by email that *"it appears as though this [sale] would be a sensitive sale to the point where homeland security might have to be notified and such."* GHAHREMAN then attempted to order six units of the NAVIGAT 2100 on behalf of C-1 and the Dubai

Company. In requesting the gyrocompasses, GHAHREMAN informed the U.S. supplier that the customer was the Dubai Company and the end user/end use was for installation aboard a marine vessel owned by a shipping company located in Dubai, U.A.E. However, the U.S. manufacturer, Northrop, refused to conduct the sale finding the end user information provided by GHAHREMAN and his coconspirators was suspect. The U.S. supplier notified GHAHREMAN that Northrop denied the sale because it found that the stated end use of the NAVIGAT 2100 on board such a small vessel was suspect -- *"it would be like putting a Mercedes engine in a tricycle."*

12. In December 2012, Northrop also informed HSI agents of the suspicious request by GHAHREMAN and the Dubai Company. After learning of this suspicious request, I requested that the U.S. supplier provide GHAHREMAN with the contact information for an HSI undercover agent, who was posing as a broker of U.S. goods and technology (the "UCA"), and requested that the U.S. company inform GHAHREMAN that the UCA may be able to assist him in obtaining the NAVIGAT 2100s.

13. On December 21, 2012, GHAHREMAN emailed the UCA and stated that he had a friend in Dubai, U.A.E. (i.e., C-1) who needed six units of the NAVIGAT 2100. GHAHREMAN provided the UCA with his telephone number and requested that the UCA contact him soon. In a recorded telephone conversation with the UCA on the same day, GHAHREMAN explained that he had previously contacted a U.S. supplier, but the U.S. supplier could not complete the sale, stating *"no, this is not good for this company, or something."* The UCA informed GHAHREMAN that the NAVIGAT 2100 was manufactured by Northrop, and they were primarily producing the gyrocompass for the U.S. Coast Guard. GHAHREMAN stated he was aware of the manufacturer, but *"his friend"* (i.e., C-1) did not want GHAHREMAN to go directly to the manufacturer, but instead *"he wants something in stock which is available."*

14. On January 3, 2013, the UCA emailed GHAHREMAN a sales quote for four units of the NAVIGAT 2100, for a total price of $284,000. In a recorded phone call with GHAHREMAN of that same day, GHAHREMAN stated his customer *"requested for one hundred units gyro,"* and that *"about the [NAVIGAT] 2100 they are very serious, that is, they made contract already..."* The UCA explained to GHAHREMAN that if the UCA tried to purchase one hundred units of the NAVIGAT 2100, the manufacturer would have a lot of questions about the end user, and the manufacturer would assume the

customer was a foreign government. The UCA then asked GHAHREMAN *"do we really want to go down that road?"* GHAHREMAN stated he understood, and he was *"not happy"* with the number requested by the customer, but he still wanted to go forward with the purchase of the four units of the NAVIGAT 2100. GHAHREMAN stated that if the UCA wanted to sell more than four units, they would be willing to purchase them.

15. On January 4, 2013, during a recorded phone call, GHAHREMAN confirmed that they wanted to purchase six units of the NAVIGAT 2100. The UCA explained that due to GHAHREMAN's prior dealings with the U.S. supplier and manufacturer, the UCA would have to order the items by providing false end user information to the manufacturer, because the manufacturer already rejected the end user information provided by GHAHREMAN and the Dubai Company. GHAHREMAN stated that he understood.

16. In email exchanges between GHAHREMAN and C-1 and the Dubai Company of January 4, 2013, the Dubai Company sent a signed contract to GHAHREMAN which authorized him to act as a representative of Dubai Company in the acquisition of U.S. goods to include six units of the NAVIGAT 2100, electronic parts, and other items. The contract also included commission terms for GHAHREMAN. The contract was signed by YILDIZ, as the President of the Dubai Company.

17. On January 4, 2013, the UCA sent an email to GHAHREMAN with a price quotation and a sales contract for six units of the NAVIGAT 2100. The following day, GHAHREMAN provided the documents to C-1. On January 6, 2013, C-1 communicated with GHAHREMAN, stating that there were *"lots of point which makes the deal unsafe ... The guy is asking for half a million dollar with no guarantee and responsibility and security."* On January 7, 2013, GHAHREMAN provided C-1 with further terms of the transaction, including the use of a standby letter of credit for part of the payment from the Dubai company to the UCA. The following day, C-1 replied to GHAHREMAN stating, *"This is exactly what I need it is perfect we move ASAP."*

18. On January 31, 2013, GHAHREMAN emailed the UCA a scanned copy of the contract for the NAVIGAT 2100s, which included the Dubai Company stamp on each page, as well as *"Witnessed by: Arash Ghahreman"* written by hand, with the apparent signature of GHAHREMAN.

The document also had C-1's name and *"directing manager"* written by hand, with the apparent signature of C-1.

19. In a recorded phone call on February 14, 2013, GHAHREMAN stated that the Dubai Company wanted to change the contract and only purchase four units of the NAVIGAT 2100.

20. On February 19, 2013, C-1 emailed the UCA, with a cc: to GHAHREMAN, and included a funds transfer receipt for a bank in Dubai showing a transfer to the UCA bank account in the amount of $10,000, as a down payment for the four units of the NAVIGAT 2100s. The header information for the email from C-1 indicated the email was sent from an internet protocol (IP) address located in Iran. On February 20, 2013, the UCA's bank account in San Diego received a wire transfer of approximately $10,000 from a bank in Dubai.

21. On February 20, 2013, the UCA emailed C-1, with a cc: to GHAHREMAN, acknowledging receipt of the $10,000, but reminding C-1 that in order to initiate the order for the NAVIGAT 2100s with the manufacturer, as required by the sales contract, C-1 still needed to provide an additional $18,400 as a down payment. After continued discussions via email, on March 6, 2013, GHAHREMAN emailed the UCA, and included a funds transfer receipt from a bank in Dubai showing the transfer of $18,000 to the UCA's bank account. Later that day, the UCA bank account in San Diego received a wire transfer of approximately $18,000 from a bank in Dubai. The same day, the UCA sent an email to GHAHREMAN in which he acknowledged receipt of the down payment, and stated that he had placed the order for the four NAVIGAT 2100s with the manufacturer. The UCA attached a copy of a purchase order receipt from the manufacturer.

22. In March 2013, the UCA sent GHAHREMAN an email, in which he invited GHAHREMAN and C-1 to attend the UCA's company retreat in Las Vegas in early May 2013. On March 20, 2013, GHAHREMAN emailed the UCA, and accepted the invitation on behalf of C-1 and himself. On April 2, 2013, the UCA emailed GHAHREMAN a formal invitation letter for C-1, which C-1 could present when applying for a U.S. visa. On April 4, 2013, GHAHREMAN emailed the UCA a copy of C-1's Iranian passport, as well as an email request from C-1. GHAHREMAN requested that the UCA keep the contents of C-1's email request confidential. Specifically, C-1 requested that the UCA change his title in the invitation letter from *"directing manager"* to *"business development manager"*

or *"owner"* because he was not listed as the "directing manger" in the licensing papers of the Dubai Company. C-1 explained that due to his Iranian nationality and for *"smooth operation"* of the Dubai Company, he assigned a German national as the manger in the license of the Dubai Company. C-1 explained that *"[i]f the embassy ask for any papers for the position of directing manager then I do not have it and it may make difficulties and you know they are sensitive in these matters."*

    23. On May 2, 2013, during a recorded phone call, GHAHREMAN informed the UCA that C-1 was no longer planning to travel to the U.S. for fear of being arrested. During the conversation, GHAHREMAN stated that C-1 was located in Iran, and that C-1:

> *" would love to come you know, that is, if you see the news, . . . politic things that is happen [sic], not business things you understand. Somebody want to purchase something from the United States go to jail or something."*

    24. On May 16, 2013, during a recorded phone call, the UCA and GHAHREMAN discussed the NAVIGAT 2100 transaction, and the UCA discussed the importance of being very cautious when dealing with the standby letter of credit. The UCA reminded GHAHREMAN that when GHAHREMAN and C-1 initially attempted to purchase the NAVIGAT 2100s from the U.S. supplier, the manufacturer stated *"we don't like the end use, . . . we don't believe this is for end use in Dubai . . . we think it is going to be shipped somewhere else."* The UCA stated that this was why GHAHREMAN and C-1 approached the UCA for assistance. The UCA stated that because the manufacturer refused to sell the NAVIGAT 2100s to the Dubai Company, the UCA falsely provided the manufacturer with the name of an end user in Panama for the transaction. The UCA explained that for this reason, they had to be very careful in the paperwork and information they provided to the bank in obtaining the standby letter of credit. The UCA stated they did not want the bank, during their verification process, to contact the manufacturer to verify the contract between the UCA and the Dubai Company because that contract would not match the end user information the UCA provided to the manufacturer. The UCA explained that was why he had enlisted the aid of his financial assistant (another HSI undercover agent), who, with the assistance of a local bank branch president, could ensure that the standby letter of credit would be processed without any background investigation by the bank's central office. The UCA stated:

> *"Just remember, explain to [C-1], that he's not here in the U.S., that you and I have to be more careful, because we are the ones taking all the risks, with the big companies, with the export laws, with everything. So explain it to him that, yeah, it's a little bit of a*

> *headache, but guess what, we're the ones taking the risks, and we're the ones going to keep everybody, keeping in business."*

GHAHREMAN responded, stating he agreed and understood.

25. On May 17, 2013, during a recorded phone call, GHAHREMAN asked the UCA if it was possible for the Dubai Company president (YILDIZ) to attend the meeting in Las Vegas, which had been rescheduled for June 2013. Later the same day, C-1 emailed a copy of C-2's German passport to the UCA, with a cc; to GHAHREMAN.

26. In subsequent emails and phone calls between GHAHREMAN, C-1, and the UCA, C-1 related that he wanted to change the terms of the contract to an "at sight" letter of credit through his bank, rather than the bank originally proposed by the UCA and agreed upon by all parties.

27. On May 28, 2013, during recorded telephone conversations with GHAHREMAN, the UCA informed GHAHREMAN that while in Las Vegas, GHAHREMAN and YILDIZ could view the NAVIGAT 2100, and they could all ship it together if they wanted. The UCA also told GHAHREMAN that the manufacturer originally refused the Dubai Company's order for the NAVIGAT 2100 because the manufacturer believed the items would be transshipped to Iran. The UCA also stated he was taking a lot of risk because GHAHREMAN, C-1, and he all knew the NAVIGAT 2100s were going to an end user in Iran. The UCA also informed GHAHREMAN that both he and his partners knew that the end user originally provided by the Dubai Company for the transaction was a lie. In response, GHAHREMAN stated, in part:

> *"He [C-1] told us for Dubai and we deliver to Dubai, we didn't know about anything else, and I don't know about anything else. I never ask [C-1] what he wants to do, that he wants to do ... I never ask him even I suspect or I guess or something, I never ask him, this is not my business, he wanted to have this delivered to Dubai, I deliver to him to Dubai ... if you sell something in this country to me today, and ... six months later, (it) is . . . going to Africa, Sudan, or some civil war country or something over there, ... this is not your fault . . . . [C-1] also provide the end user, . . . and if he knows that is going to own country [Iran], or something, (it is) his problem, and . . . he should answer to UAE not here, and (he) is going to jail over there, not here."*

During that conversation, the UCA reiterated that he was concerned the ultimate Iranian end user would call the manufacturer if there was ever a problem with the gyrocompasses, and thereby alert the manufacturer that the UCA had illegally exported the gyrocompasses to an Iranian end user, GHAHREMAN attempted to allay the UCA's concerns by telling him that if the gyrocompasses ever

needed service, the end user could simply ship them to Panama, and adding, *"we know what is going on."*

**E. <u>Activities by GHAHREMAN and Coconspirators Seeking the Y-690</u>**

28. At the same time that GHAHREMAN and C-1 were seeking to purchase the NAVIGAT 2100s, they were also seeking numerous other U.S. goods and technology, including the Y-690. On January 2, 2013, C-1 communicated with GHAHREMAN asking if he could obtain several U.S. made electronic components, including 100 units of the Y-690. The same day, GHAHREMAN emailed the UCA requesting a price quotation for the same parts. In response, on January 4, 2013, the UCA provided a price quotation for the Y-690 of $2,045 per unit.

29. After receiving the price quotation, GHAHREMAN had further email communications with the UCA regarding the purchase of the Y-690, and eventually requested a draft sales contract for 50 units of the Y-690. After the UCA emailed GHAHREMAN a proforma invoice for 50 units, on January 15, 2013, GHAHREMAN emailed the UCA asking for the *"drawing or data sheet to finalize the deal and contract with the customer."*

30. On January 16, 2013, the Iranian customer thanked C-1 for the data sheet for the Y-690, and requested a proforma invoice and delivery time for 100 units of the Y-690. Thereafter, on February 27, 2013, the Iranian customer sent to C-1 a two page document on letterhead for a company located in Tehran, Iran. The document was a request for quote, signed by the Iranian customer, for various electronic parts, including 100 units of the Y-690.

31. On February 21, 2013, during a recorded phone call, the UCA and GHAHREMAN discussed the sale and exportation of the Y-690 units to C-1. The UCA explained to GHAHREMAN that a U.S. export license was required to export the Y-690 to anywhere outside the U.S., and the license required information regarding the end user. The UCA stated that the manufacturer would provide the end user information to a U.S. government agency that issues the export license, and the government agency would look into the end use. GHAHREMAN stated that he and C-1 did not want the UCA to provide the manufacturer with the actual end user information, stating *"I am sure that we do not want to release the end user name."* The UCA explained that he could provide false end user information to the manufacturer, but if he did so, C-1, GHAHREMAN, and the actual end user could not go directly

back to the manufacturer for repairs or replacement if there were any problems with the parts. If they did so, the manufacturer would then become aware that the parts did not go to the end user listed in the export license. GHAHREMAN indicated that he understood.

32. On March 10, 2013, the UCA emailed GHAHREMAN a revised draft sales contract for 50 units of the Y-690. In a reply email the same day, GHAHREMAN stated *"please consider the contract signed."* On March 12, 2013, GHAHREMAN emailed the UCA a signed contract for the 50 units of the Y-690.

33. On May 13, 2013, during a recorded phone call, the UCA reminded GHAHREMAN that because the Y-690 was export controlled, as requested by GHAHREMAN and C-1, the UCA was providing the manufacturer of the Y-690 with false end user information.

34. On May 16, 2013, the UCA emailed GHAHREMAN a purchase order reflecting the sale of 50 units of the Y-690 to the UCA's company.

35. On May 20, 2013, during a recorded phone call, the UCA and GHAHREMAN further discussed the Y-690 transaction. The UCA explained that he didn't care who the actual end user was, but emphasized that the Y-690 was designed for military use, and that was why it needed a special export license. GHAHREMAN stated he understood. The UCA told GHAHREMAN that C-1 should understand that if they were not smart and careful in their business dealings, and got caught, then the UCA and GHAHREMAN *"will go to jail."* The UCA further explained that they had to *"make sure that, you know, we don't go to jail, and that nobody catches us, and that nobody ever knows that we didn't do it right."* Again, GHAHREMAN stated he understood.

36. On May 28, 2013, during the recorded phone call discussed above, the UCA reminded GHAHREMAN that they did not have a license to export the Y-690's to Dubai. The UCA also stated that he was helping GHAHREMAN and C-1 get the Y-690's to the real end user, in Iran.

### F. GHAHREMAN, YILDIZ and Coconspirators Accept Terms for the Payment and Partial Delivery of the NAVIGAT 2100s and Y-690s

37. During a recorded phone call with GHAHREMAN of May 30, 2013, the UCA proposed that he would bring one complete set of the NAVIGAT 2100 and approximately two (2) units of the Y-690 to a meeting with GHAHREMAN and YILDIZ scheduled in Las Vegas, Nevada on or about June 11, 2013. The UCA stated that GHAHREMAN and YILDIZ could view the equipment and assist in

packing the equipment for shipment. The UCA further stated that once they notified C-1 that they had seen the equipment and packaged it for shipping, C-1 would then need to pay an additional 40 percent of the contract price for that one unit of the NAVIGAT 2100. The UCA stated that as soon as he received the payment, GHAHREMAN, C-2 and the UCA would go to a commercial shipper and ship the one unit of the NAVIGAT 2100 to the Dubai Company. The UCA would then provide the bill of lading to GHAHREMAN and YILDIZ. The UCA requested that as soon as the NAVIGAT 2100 arrived in Dubai, C-1 would have to pay the remaining balance due for the one unit. After this first transaction was complete, the UCA stated that they should then be able to trust each other, and they could decide whether they wanted to ship the remaining three units together, or ship them one at a time. The UCA stated that he was making this proposal to reduce the risks from their illegal venture:

> *"...I also reduced our risk to where we're not risking a lot product having not been paid, and most importantly to me, this is what's important to me, I'm reducing our risk as a business by not turning over important paperwork to a bank underwriter, who could ultimately, you know, figure things out, get me in trouble, and get me put in jail, you see what I'm saying, I'm keeping our business private..."*

38. On May 30, 2013, the UCA emailed GHAHREMAN the details regarding the payment and delivery terms described above, but also stating that he would require 100% payment for the two Y-690s.

39. On May 30, 2013, GHAHREMAN and C-1 had a telephone conversation with the UCA. During that recorded call, GHAHREMAN stated that C-1 had read the UCA's email with the terms for payment and shipping, and the terms were acceptable. GHAHREMAN stated C-1 would deposit money into GHAHREMAN's U.S. bank account for the transaction. The UCA stated that the most important issue for him was making sure that he conducted business in the safest way possible for his company, and that they had to be careful about the information they provide to a bank, because it wasn't good for a bank to have access to their very private information. However, GHAHREMAN interrupted the UCA and stated they could talk about that later, and *"I don't want over the phone we talk about that issue."* C-1 stated the terms provided by UCA were workable, and the deal could be done, but there were a few little changes they wanted to discuss. C-1 stated they would email the UCA with the details. C-1 stated "...you have to be secure and we have to be secure..."

40. On June 1, 2013, YILDIZ emailed the UCA, with a cc: to C-1 and GHAHREMAN, in which he indicated that he had read the UCA's May 30, 2013, email regarding the payment and delivery terms for the NAVIGAT 2100 and the Y-690s, and stated that he agreed with the terms and was planning to travel to Las Vegas, Nevada to conduct the transaction. Specifically, YILDIZ stated in part:

> *"Basically it's ok for me. To see the goods and test them will eliminate any second thoughts. Since we can do it on the Spot, it will make it easier. . . . Once me and Mr. Arash [GHAHREMAN] has verified the product, we will wire the money and take the product with us. When the product has been accepted from the end user, we will proceed with the remaining pieces. Please arrange the needful for my trip [sic]. . . ."*

### H. GHAHREMAN and YILDIZ meet with UCAs in Las Vegas, Nevada

41. On June 12, 2013, GHAHREMAN traveled by airplane from Newark Airport, New Jersey, to Las Vegas, Nevada, to meet with the UCA. On or about June 12, 2013, YILDIZ traveled by airplane from Dubai, UAE, via Los Angeles, California, to Las Vegas to meet with the UCA.

42. On June 12, 2013, GHAHREMAN met with the UCA at a Las Vegas restaurant. That meeting was surveilled and consensually monitored and recorded by HSI agents. During that meeting, the UCA and GHAHREMAN discussed the NAVIGAT 2100 and Y-690 transactions as well as future transactions. During the meeting, the UCA informed GHAHREMAN that he brought the NAVIGAT 2100 and the accessories (power supply, control unit, cables), and two units of the Y-690s. GHAHREMAN stated he wanted to "check" the NAVIGAT 2100 and turn it on. After testing the item, GHAHREMAN stated that C-1 could transfer the payment for the NAVIGAT 2100 within three or four hours. GHAHREMAN stated that he would talk to C-1 about the *"problem"* of insurance for shipping the items, since they could not declare the true value of the items when shipping. Regarding the shipment of the goods, GHAHREMAN stated *"I don't have license for export."* The UCA stated that the Y-690s were very small, and YILDIZ could take them with him on the plane. GHAHREMAN stated that maybe YILDIZ would not have a problem, but did not think YILDIZ should take them on a plane.

43. During the above-described meeting, GHAHREMAN also made statements which evidenced that he knew the NAVIGAT 2100 and Y-690s were destined for end use in Iran. Specifically, the UCA told GHAHREMAN that it was obvious to him that for the NAVIGAT 2100s, the customer

was *"in your [GHAHREMAN's] home country"* (i.e., Iran). The UCA stated that it was problematic to ship things like the NAVIGAT 2100 to Dubai, because many people worried that shipments going to Dubai would actually go to *"your home country."* The UCA stated that if he knew a shipment was going to *"your home country,"* they needed to be safe. The UCA stated that he could work with another end user somewhere else, like Panama, and pay them to falsely state that they received items which the UCA would actually ship to one of GHAHREMAN's customers. The UCA stated that he, C-1 and GHAHREMAN all knew the NAVIGAT 2100s were not really for a customer in Dubai, and he thought it was disrespectful for C-1 to tell him [UCA] that the NAVIGAT 2100s were for a customer in Dubai. GHAHREMAN stated *"something I let you know, in the business, even in the United States, if you know nothing about, that is, something, is better for you, not, not, you protected."* GHAHREMAN further stated *"even I don't ask [C-1], you know, who is the end user, I know somebody because I have so many connections in Iran, I know where is going... but anyways, I don't ask [C-1]...."* The UCA clarified that *"on this deal"* GHAHREMAN never had to ask C-1 to know *"where it was going to in your home country,"* because GHAHREMAN knew from his other connections where it was going. GHAHREMAN stated *"normally I don't ask."* GHAHREMAN stated he had a lot of good connections, and explained that he could find out if one of his connections obtained something from C-1. GHAHREMAN also stated that he knew the NAVIGAT 2100s were going for *"the commercial ... for ferry ship."* The UCA clarified the gyrocompasses were going to a ferry ship *"in your country."* As to the Y-690s, the UCA reiterated that the Y-690s were considered military items. The UCA asked if the Y-690s would be used by the military *"over there."* GHAHREMAN stated that he did not know, but they would be used for *"government"* but not *"military,"* and would be used at an airport.

44. On June 13, 2012, GHAHREMAN and YILDIZ met with UCA and another HSI undercover agent who was posing as the UCA's boss ("UCA-2") at a hotel suite at a hotel in Henderson, Nevada. At the beginning of the meeting, YILDIZ introduced himself as the partner of C-1 (the owner of the Dubai Company). During that meeting, the UCAs showed GHAHREMAN and YILDIZ a NAVIGAT 2100 and two Y-690s, which unbeknownst to GHAHREMAN and YILDIZ were inert devices. After viewing the items, YILDIZ spoke with C-1 by telephone. During his telephone

conversations with C-1, YILDIZ told C-1 that he thought the products were satisfactory and he would send him two pictures of the product. YILDIZ also confirmed that C-1 would wire the money for payment of the items to the UCA's bank account. During the meeting at the hotel suite, as set forth below, the UCAs discussed the NAVIGAT 2100/Y-690s transaction and future transactions for goods destined to Iran with GHAHREMAN and YILDIZ:

a. Discussion re the false end user statements for the NAVIGAT 2100 and Y-690 – The UCA and YILDIZ discussed the past problems YILDIZ , C-1 and GHAHREMAN had in attempting to acquire the NAVIGAT 2100s. YILDIZ admitted that when they first approached a U.S. supplier to purchase the NAVIGAT 2100s, he (YILDIZ) was the individual who signed the end user certificate which represented that the end user/end use was for installation aboard a marine vessel owned by a shipping company located in Dubai. YILDIZ also agreed that the U.S. manufacturer refused to sell the NAVIGAT 2100s to them for two reasons: (1) the manufacturer found that his stated end use of the NAVIGAT 2100, i.e., for use in a small vessel, did not make sense – it would be like *"putting a race car engine in a golf cart;"* and (2) the manufacturer highly suspected that the NAVIGAT 2100s were going to be used in Iran. The UCA explained that this is why the UCA's company falsely told the U.S. manufacturer that the NAVIGAT 2100s he obtained were being purchased for a customer in Panama. With regard to the Y-690s transaction, the UCA explained that he was able to obtain the Y-690s for GHAHREMAN, YILDIZ and C-1 by falsely telling the U.S. manufacturer that he was purchasing them for a customer in Prague, Czech Republic. YILDIZ then stated that he wanted the UCAs to send the Y-690s to Prague for transhipment to him. YILDIZ expressed concerns about dealing with military items such as the Y-690 because of the extra risks it posed to his suppliers ... *"this kind of things [Y-690s] were too dangerous."*

b. Discussions re avoiding the Iranian trade sanctions and future transactions for goods destined to Iran – The UCA explained to GHAHREMAN and YILDIZ that the UCAs' company had no problem taking their business for Iranian end users, *"like on the gyro [NAVIGAT 2100], for Iran."* The UCA explained that there was no need for them to explicitly state in their email or telephone requests that the end user was in Iran; that they should simply tell the UCA to *"handle the customer*

*information"* and he would know it was for a customer in Iran. The UCA explained that he knew the U.S. export regulations and he knew how to evade the Iranian trade sanctions. In response, YILDIZ indicated that he understood. The UCA further stated that his boss (UCA-2) wanted the UCA to discuss the situation with goods going to Iran with GHAHREMAN; however, the UCA stated, *"it's not a conversation I think you have over the telephone."* YILDIZ agreed, stating in part, *"even for me, for me, to be honest, that's why I kept very less in communication with you, because I know that my phones are monitored...."* The UCA also promised that he would not overcharge them simply because the end user was in Iran. The UCA explained that because of the Iran sanctions, and the fact that YILDIZ and GHAHREMAN were *"doing business with an end user in Iran,"* The UCA knew that some suppliers had taken advantage of YILDIZ and his associates by changing the terms or raising prices. YILDIZ agreed and stated that this had happened *"many times, many times, not once . . ."* The UCA promised YILDIZ that even though the UCA knew the real end user was in Iran, he would not similarly take advantage of YILDIZ or his associates.

c. <u>Discussions re risks of getting caught and going to jail</u> – The UCA explained to YILDIZ that because of the Iranian trade sanctions and the fact that the UCAs and GHAHREMAN were the ones living in the U.S., if they or YILDIZ did not handle their business properly, the UCAs and GHAHREMAN would go to jail. GHAHREMAN added that they *"have to be careful"* or he (GHAHREMAN) would be sharing the *"same [jail] cell with these two guys (i.e., the UCAs)."* In reply, YILDIZ acknowledged the risks, and stated that he was facing the same consequences in the United Arab Emirates.

d. <u>Discussions re shipment of NAVIGAT 2100 and Y-690s to avoid detection by Customs officials</u> – As to the shipment of the items, the UCAs, YILDIZ and GHAHREMAN discussed ways to ship the items in order to avoid detection by Customs officials, to include: (1) repackaging the items by shipping them in different boxes and packaging so as to conceal the nature of the item and the manufacturer's name; (2) shipping any manuals for the items separately and replacing them with manuals unrelated to the items; and (3) transhipping the Y-690s to YILDIZ, via a third country, i.e., Czech Republic. As to the shipping invoices, the UCA stated that because the NAVIGAT 2100 was not

going directly to Iran, they could declare its true value for shipping purposes. In addition, in discussing the transaction for the NAVIGAT 2100s, UCA-2 explained that if the end users in Iran had any technical problems with the NAVIGAT 2100s, he did not want the end users to send the item back to the U.S. manufacturer, because it would cause the UCAs problems. GHAHREMAN promised the UCAs that this would not happen, and as an extra precaution, they would remove the serial number and identifying information from the NAVIGAT 2100s. As a result of these discussions, YILDIZ subsequently informed C-1, via telephone, that they had a *"good strategy"* to ship the items out of the U.S.

e. Discussions with YILDIZ re end user of the NAVIGAT 2100s – With regard to the actual end use for the NAVIGAT 2100s, YILDIZ stated that he needed to check with C-1, but he thought the NAVIGAT 2100s were for Iranian owned vessels in Dubai. Later, the UCA asked how the NAVIGAT 2100 would be shipped from Dubai to Iran. YILDIZ stated that they would be shipped via sea, and that *"this is nothing, we ship more bigger, more complicated stuff over . . ."* YILDIZ added that while the end use will be on vessels located in Dubai, the end user was a company in Iran, that the owner and license owner were in Iran. YILDIZ added that the owner was on a *"black list."* Based on my training and experience, I believe that YILDIZ was referring to the OFAC Blocked List. I know that U.S. laws prohibit transactions with such individuals or companies.

f. Discussions with YILDIZ and GHAHREMAN re the end user of the Y-690 – The UCA asked YILDIZ and GHAHREMAN who would be using the Y-690s in Iran. In YILDIZ's presence, GHAHREMAN indicated that the Y-690s would be used at airports in Iran, but claimed it would not be for military use. YILDIZ also indicated the Y-690s were not for military use.

Ultimately, YILDIZ and GHAHREMAN agreed that after the UCAs received confirmation of C-1's wire transfer of the payments for the NAVIGAT 2100 and Y-690s, they would accompany the UCAs to a commercial carrier to ship the items.

45. The next day, on June 14, 2013, the UCA had a telephone conversation with GHAHREMAN and YILDIZ, in which they discussed the delay in getting confirmation of the wire transfer payment. The UCA indicated that because of the difference in the banking hours between Dubai and the U.S., it did not appear that the UCAs would be able to get confirmation of the wire transfer until

Monday, June 17, 2013. GHAHREMAN and YILDIZ then agreed that one or both of them would travel to San Diego, California, and after confirmation of the wire transfer, they would ship the items from San Diego.

46. On or about June 17, 2013, C-1 caused an additional payment of $32,590 for the NAVIGAT 2100 and Y-690s to be wired from a bank in Dubai to the UCA's bank account in San Diego, California.

47. In January 2013, I received a license history from the Department of Treasury, Office of Foreign Assets Control, stating that there were no applications for, or OFAC licenses issued to GHAHREMAN, C-1, or the Dubai Company itself.